17-1343
*Corren v. Donovan*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2017

(Argued: January 17, 2018          Decided: July 31, 2018)

Docket No. 17-1343
_____

DEAN CORREN, MARJORIE POWER, VERMONT PROGRESSIVE PARTY, RICHARD KEMP,
STEVEN HINGTGEN,

*Plaintiffs-Appellants,*

DAVID ZUCKERMAN, Senator,

*Intervenor-Plaintiff-Appellant,*

– v. –

JAMES C. CONDOS, Vermont Secretary of State, in his official capacity, THOMAS J.
DONOVAN, JR., Vermont Attorney General, in his official capacity,

*Defendants-Appellees.*

_____

B e f o r e:

KATZMANN, *Chief Judge,* KEARSE and POOLER, *Circuit Judges.*

_____

Appellants, former and prospective candidates for public office in Vermont and a political party, brought this action asserting that Vermont's public election financing system, which allows candidates to receive grants of public funds if they abide by certain limitations, violates the First Amendment rights of candidates, their supporters, and political parties. The provisions that appellants challenge prohibit publicly financed candidates from accepting contributions or making expenditures beyond the amount of the grants and announcing their candidacies or raising or expending substantial funds before a certain date. The district court (Sessions, *J.*) dismissed all of appellants' claims for failure to state a claim and denied their motion for attorney's fees. We hold that, because candidates may freely choose either to accept public campaign funds and the limitations thereon or to engage in unlimited private fundraising, those limitations do not violate First Amendment rights. In addition, appellants are not entitled to a fee award because they cannot be considered prevailing parties. Accordingly, the judgment of the district court is **AFFIRMED**.

———————————

JOHN L. FRANCO, JR., Law Office of John L. Franco, Jr., Burlington, VT, *for Plaintiffs-Appellants and Intervenor-Plaintiff-Appellant*.

EVE JACOBS-CARNAHAN, Assistant Attorney General (Megan J. Shafritz, Assistant Attorney General, *on the brief*), Montpelier, VT, *for Defendants-Appellees*.

———————————

KATZMANN, *Chief Judge*:

This appeal requires us to decide whether Vermont's campaign finance law, Vt. Stat. Ann. tit. 17, §§ 2901 *et seq.*, which imposes additional restrictions on candidates who choose to receive public campaign finance grants, violates the First Amendment of the United States Constitution.

2

Appellants are several former and prospective candidates for Vermont Lieutenant Governor, as well as the Vermont Progressive Party. They brought this action under 42 U.S.C. § 1983, asserting that provisions of Vermont's "Public Financing Option," Vt. Stat. Ann. tit. 17, §§ 2981–2986 (the "Option"), violate the First Amendment and seeking declaratory and injunctive relief. In particular, appellants challenged provisions that prohibit publicly financed candidates ("PFCs") from (1) accepting more than a specified amount of campaign contributions, which are defined to include (with some exceptions) expenditures made by political parties in coordination with those candidates; (2) expending funds beyond the total amount of the public grants; and (3) announcing their candidacies or raising or expending more than a specified amount of funds before February 15 of an election year.

The district court (Sessions, *J.*) dismissed all of appellants' claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and denied appellants' motion for reconsideration and for attorney's fees under 42 U.S.C. § 1988(b). Appellants mainly argue on appeal that the district court erred in upholding the challenged restrictions because those restrictions unfairly and unjustifiably burden the speech and associational rights of PFCs, their

supporters, and political parties. However, because a candidate may freely choose whether to accept public funds and the conditions thereon in lieu of unlimited private fundraising, and presumably will make that choice only if she believes that doing so will expand her powers of speech and association, she cannot complain that those conditions burden her rights. Nor can the candidate's supporters and any political party with which she is affiliated complain that the limitations resulting from the candidate's voluntary choice burden their own rights. Thus, appellants' constitutional claims were properly dismissed. In addition, the district court correctly concluded that appellants were not prevailing parties eligible to receive attorney's fees. We therefore **AFFIRM** the judgment of the district court.

## BACKGROUND

### I. Vermont's Campaign Finance Law

In 1997, in an effort to lessen the influence of money in politics, the State of Vermont enacted a stringent campaign finance law. *See* An Act Relating to Public Financing of Election Campaigns, Disclosure Requirements and Limits on Campaign Contributions and Expenditures, 1997 Vt. Acts & Resolves 490 (codified at Vt. Stat. Ann. tit. 17, §§ 2801 *et seq.*) (repealed 2014) ("Act 64"). Act 64

4

imposed caps on the total expenditures that each candidate could make during an election cycle, as well as tight limits on the amount of contributions that a candidate could accept from a single individual or organization. *See id.* at 497–99. It also established a system of public election financing. *See id.* at 491–95. Yet Act 64's regime was short-lived: in 2006, the Supreme Court invalidated much of the law, holding that its limits on expenditures and contributions were unconstitutionally restrictive. *Randall v. Sorrell*, 548 U.S. 230, 236 (2006) (plurality opinion). *Randall* did not, however, pass upon the validity of the public financing system. *Id.* at 239.

In 2014, Vermont repealed Act 64 and enacted a revised campaign finance law, *see* An Act Relating to Campaign Finance Law, 2014 Vt. Acts & Resolves 1 (codified at Vt. Stat. Ann. tit. 17, §§ 2901 *et seq.*) ("Act 90" or "the Act"), which loosened some of the restrictions that the Supreme Court held unconstitutional in *Randall*. The Act wholly dispenses with across-the-board limits on the total expenditures that candidates can make during an election cycle, whereas it still imposes limits, albeit less stringent ones, on the amounts of contributions that a candidate may accept from particular sources. *See* Vt. Stat. Ann. tit. 17, § 2941. For example, a candidate for lieutenant governor "shall not accept contributions

5

totaling more than" $4000 from an individual or an organization that is not a

political party. *Id.* § 2941(a)(3)(A); *see id.* § 2901(16).

Act 90 defines a "contribution" as any payment, loan, or gift that is made

"for the purpose of influencing an election, advocating a position on a public

question, or supporting or opposing one or more candidates in any election." *Id.*

§ 2901(4). Also treated as contributions are "related campaign expenditure[s],"

which are expenditures made by third parties in coordination with a candidate

or her committee that promote the election of the candidate or the defeat of the

candidate's rivals. *Id.* § 2944(a)–(b). However, the Act exempts from the

definition of contribution a series of items and activities. *Id.* § 2901(4)(A)–(M).

These exemptions include, *inter alia*, "the use of a political party's offices,

telephones, computers, and similar equipment," *id.* § 2901(4)(F), lists of

registered voters maintained by a party, *id.* § 2901(4)(H), party-sponsored

campaign events for three or more candidates, *id.* § 2901(4)(L), and general get-

out-the-vote efforts, *id.* § 2901(4)(M). The legislative findings contained in the Act

explain that "[e]xempting certain activities of political parties from the definition

of what constitutes a contribution is important so as to not overly burden

collective political activity" and to "protect the right to associate in a political

6

party," as those exempted activities "are part of a party's traditional role in assisting candidates to run for office." 2014 Vt. Acts & Resolves 2.

In addition, contributions from political parties to candidates are exempted from Act 90's contribution limitations; simply put, candidates "may accept unlimited contributions from a political party." Vt. Stat. Ann. tit. 17, § 2941(a)(1)(B), (a)(2)(B), (a)(3)(B). Act 90's findings explain that political parties' "important" and "historic" role in campaigns distinguishes them from political committees and makes it "appropriate to limit contributions from political committees without imposing the same limits on political parties." 2014 Vt. Acts & Resolves 2.

Act 90's "Public Financing Option" (the "Option"), which was carried over in substantially similar form from Act 64, offers public funding to qualifying candidates running for governor or lieutenant governor, and it imposes an additional set of restrictions on candidates who accept that offer. *See* Vt. Stat. Ann. tit. 17, §§ 2981–2986. To qualify for public financing, a candidate must obtain a certain value and number of "qualifying contributions" during the "Vermont campaign finance qualification period," *id.* § 2984(a), which spans from February 15 of an election year until the fourth Thursday after the first

Monday in May of that year, *id.* §§ 2356, 2981(4). For example, a candidate for lieutenant governor must raise "a total amount of no less than $17,500.00 collected from no fewer than 750 qualified individual contributors making a contribution of no more than $50.00 each." *Id.* § 2984(a)(2). Once a candidate qualifies for public financing, she receives grants for the primary and general election periods. *Id.* § 2985(a)(1). A candidate for lieutenant governor receives "$50,000.00 in a primary election period," less the amount of qualifying contributions the candidate collected, and "$150,000.00 in a general election period." *Id.* § 2985(b)(2).

Along with those grants come additional restrictions, which are set out in Section 2983, entitled "Vermont campaign finance grants; conditions." Section 2983(a) limits when a PFC may announce her candidacy or begin significant fundraising:

> A person shall not be eligible for Vermont campaign finance grants if, prior to February 15 of the general election year during any two-year general election cycle, he or she becomes a candidate by announcing that he or she seeks an elected position as Governor or Lieutenant Governor or by accepting contributions totaling $2,000.00 or more or by making expenditures totaling $2,000.00 or more.

8

Section 2983(b)(1) limits PFCs' ability to accept private contributions and make expenditures:

> A candidate who accepts Vermont campaign finance grants shall[] not solicit, accept, or expend any contributions except qualifying contributions, Vermont campaign finance grants, and contributions authorized under section 2985 of this chapter, which contributions may be solicited, accepted, or expended only in accordance with the provisions of this subchapter . . . .

In effect, the Option caps a PFC's campaign funding at the amount of the public grants. Finally, Section 2903(b) provides that any PFC who exceeds Section 2983(b)(1)'s limits is obligated to repay public funds and is also subject to the penalties imposed for any violation of the Act.

## II.    Factual and Procedural History

The facts giving rise to the instant case, as alleged in appellants' pleadings, are as follows. In 2014, appellant Dean Corren unsuccessfully ran for Lieutenant Governor of Vermont as the nominee of both the Vermont Progressive Party ("VPP") and the Vermont Democratic Party ("VDP"). During his campaign,

Corren qualified for and opted to receive public campaign funds for the primary and general election periods.

On October 24, 2014, the VDP disseminated an email blast that expressed support for Corren's candidacy and identified ways for recipients to support Corren and other candidates on the VDP ticket. Roughly a week later, William Sorrell, then the Attorney General of Vermont, served on Corren's campaign a "notice of alleged violation," which stated that the email blast constituted an in-kind contribution that Corren, as a PFC, could not accept under the terms of the Option. Corren disputed that the email constituted a contribution under Section 2901(4) but offered to settle the matter by paying for the estimated value of the email blast out of his campaign funds. Sorrell rejected this offer, countered with a demand of $72,000 in forfeited public campaign funds and fines, and threatened to pursue an enforcement action if Corren did not meet that demand.

Unable to reach an agreement, Corren brought an action under 42 U.S.C. § 1983 against Sorrell in his official capacity on March 20, 2015, seeking a declaratory judgment that the email blast was not an in-kind contribution and that certain provisions of Vermont's campaign finance law were unconstitutional. Vermont then filed an enforcement action against Corren in

10

state court on March 25, 2015, alleging that Corren unlawfully received and failed to report an in-kind contribution in the form of the email blast.

In May 2015, Corren amended his complaint to join appellants Steven Hingtgen, Richard Kemp, and Marjorie Power, as well as the VPP, as plaintiffs in the action. Hingtgen, Kemp, and Power are former VPP candidates for lieutenant governor and regular donors to VPP candidates. Those plaintiffs then filed a Second Amended Complaint ("SAC"). Count I of the SAC alleged that Section 2983(b)(1)'s restrictions on the contributions that PFCs may accept and the funds they may expend impose an unconstitutional burden on rights of speech and association. Count II alleged that Section 2944(c), which subjects certain party expenditures to restrictions on contributions, imposes a similar burden and is impermissibly ambiguous. Count III sought a declaration that the email blast, as well as any political party activities that are enumerated in Section 2901(4), do not constitute in-kind contributions. And Count IV alleged that Section 2903(b)'s refund requirement is unconstitutional as well.

In late 2015, appellant David Zuckerman, a Vermont State Senator who intended to run for lieutenant governor in 2016 as a PFC but worried that restrictions on PFCs would put him at a disadvantage relative to privately

11

financed candidates, intervened in the action. Count I of Zuckerman's intervenor complaint sought a declaration that Section 2983(a)'s requirement that PFCs refrain from announcing their candidacies or raising or expending a certain amount of money before a prescribed date is unconstitutional. Count II, like Count I of the SAC, challenged Section 2983(b)(1)'s contribution and expenditure limitations.

Vermont moved to dismiss the SAC, arguing that the district court must abstain, pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), from deciding Corren's claims to the extent they called into question the ongoing state enforcement proceedings against him, and that all of the plaintiffs lacked standing. The district court granted in part and denied in part the motion, concluding that it was required to "abstain from hearing Corren's challenges to Vermont's campaign finance law insofar as those challenges relate to the enforcement action currently pending against him in state court," including whether the email blast could be regulated as an in-kind contribution, but that it could consider his other challenges. App. 81. The district court also dismissed Count IV of the SAC because Section 2903(b)'s refund provision, which that Count challenged, had since been amended.

Vermont then moved to dismiss the SAC and Zuckerman's complaint for failure to state a claim. In a March 9, 2016 Opinion and Order, the district court granted the motion and dismissed all of appellants' claims under Federal Rule of Civil Procedure 12(b)(6). In the course of rejecting appellants' constitutional challenges, the district court construed Section 2901(4)'s exemptions from the definition of contribution to apply to related campaign expenditures, and it held that this statutory construction headed off possible constitutional problems by permitting political parties to make such exempted expenditures in support of PFCs. The district court dismissed the case but did so "without prejudice to re-filing in the event that the state courts offer an interpretation of the statute that is inconsistent with this Opinion and Order." App. 114.

Following entry of judgment, appellants moved for reconsideration, primarily based on a litigation position that Vermont took in the state enforcement action. The district court denied reconsideration, noting that it had abstained from deciding matters at issue in the state proceeding. At the same time, the court denied appellants' motion for fees under 42 U.S.C. § 1988, on the ground that appellants did not qualify as prevailing parties. This appeal followed.

## DISCUSSION

## I.    Standard of Review

"We review the grant of a motion to dismiss under Rule 12(b)(6) *de novo*, 'construing the complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor.'" *Elias v. Rolling Stone, LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (quoting *Chase Grp. Alliance LLC v. City of New York Dep't of Fin.*, 620 F.3d 146, 150 (2d Cir. 2010)).

Whether appellants are prevailing parties eligible to recover attorney's fees under 42 U.S.C. § 1988(b) "is a question of law that we review *de novo*." *Perez v. Westchester Cnty. Dep't of Corr.*, 587 F.3d 143, 149 (2d Cir. 2009).

## II.    First Amendment Challenges

In this appeal, appellants primarily contend that the district court erred in dismissing their First Amendment challenges to the Act's restrictions on PFCs.[1] Specifically, they argue that Section 2983(b)(1)'s restriction on contributions to

---

[1] The First Amendment provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amend. I. "Although the text of the First Amendment states that 'Congress shall make no law . . . abridging the freedom of speech, or of the press,' the Amendment applies to the States under the Due Process Clause of the Fourteenth Amendment." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n.1 (1996) (ellipsis in original).

14

PFCs (the "Contribution Limit") violates the rights of PFCs, their supporters, and political parties; that Section 2983(b)(1)'s cap on expenditures by PFCs (the "Expenditure Limit") infringes PFCs' right to self-finance their campaigns; and that Section 2983(a)'s restrictions on the timing of PFCs' announcements of their candidacies and their acceptance or expenditure of certain amounts of funds (the "Timing Restrictions") violate PFCs' rights as well.[2] We consider these challenges in turn.

## A.    The Contribution Limit

### 1.    Backdrop of Public Financing Decisions

To provide the context in which appellants make their challenge to the Contribution Limit, we first review other relevant decisions that have considered the constitutionality of public financing systems. In the foundational campaign

---

[2] We do not understand appellants to attack the constitutionality of Section 2944's treatment of related campaign expenditures as contributions in this appeal. As noted above, Count II of the SAC claimed that Section 2944's definition of a related expenditure is ambiguous and that its presumption that expenditures made on behalf of six or fewer candidates are related is unjustified. The district court dismissed that count, recognizing that this Court previously rejected similar challenges to Act 64's definition of related expenditures, *see Landell v. Sorrell* 382 F.3d 91, 145 (2d Cir. 2004), *vacated on other grounds by Randall*, 548 U.S. at 236–37, which was relevantly similar to the current definition in Section 2944, *see* 1997 Vt. Acts & Resolves 498–99. Appellants do not challenge that holding on appeal; rather, they argue that Section 2983(b)(1)'s restrictions on making such expenditures in coordination with PFCs amount to an unconstitutional burden on speech and associational rights.

15

finance decision *Buckley v. Valeo*, 424 U.S. 1 (1976), the Supreme Court addressed several challenges to the Federal Election Campaign Act of 1971, Pub. L. No. 92-225, 86 Stat. 3 (codified as amended at 2 U.S.C. § 6566, 52 U.S.C. §§ 30101–30126, 30141–30146) ("FECA"). FECA set limits on the contributions a candidate could accept from a single source, the total expenditures a candidate could make, and the independent expenditures expressly advocating the election or defeat of a candidate that third parties could make during an election cycle. *See Buckley*, 424 U.S. at 23–24, 39–40, 44, 54. In addition, FECA, in conjunction with the Presidential Election Campaign Fund Act, Pub. L. No. 92-178, 85 Stat. 497 (1971) (codified as amended at 26 U.S.C. § 9001 *et seq.*) (the "Fund Act"), established a public election financing system for presidential candidates. Under that system, a candidate who met certain eligibility criteria was entitled to $20,000,000 in funding for the general election campaign, provided that she "pledge[d] not to incur expenses in excess of the entitlement . . . and not to accept private contributions except to the extent that the fund [wa]s insufficient to provide the full entitlement." *Buckley*, 424 U.S. at 88.

The *Buckley* Court recognized that "[s]pending for political ends and contributing to political candidates both fall within the First Amendment's

16

protection of speech and political association." *FEC v. Colo. Republican Fed.*

*Campaign Comm.*, 533 U.S. 431, 440 (2001) ("*Colorado II*") (citing *Buckley*, 424 U.S.

at 14–23). But, the Court noted, "although [FECA's] contribution and

expenditure limitations both implicate fundamental First Amendment interests,

its expenditure ceilings impose significantly more severe restrictions on

protected freedoms of political expression and association than do its limitations

on financial contributions." *Buckley*, 424 U.S. at 23. As a result, *Buckley* upheld

FECA's contribution limits, while it struck down restrictions on candidates' total

campaign expenditures and independent expenditures by individuals and

groups. *Id.* at 58. *Buckley* also upheld FECA's system of public financing, rejecting

claims that the system abridged speech in violation of the First Amendment or

discriminated in violation of the Fifth Amendment. *Id.* at 90–108. In so holding,

the Court observed that the public financing system, by "us[ing] public money to

facilitate and enlarge public discussion and participation in the electoral

process," "further[ed], not abridge[d], pertinent First Amendment values." *Id.* at

92–93.

Although *Buckley* had no occasion to analyze whether the limits imposed

on candidates who accepted public financing violated those candidates' rights, it

nonetheless suggested that, in exchange for such financing, candidates could voluntarily accept restrictions that would otherwise be impermissible. Whereas the *Buckley* Court struck down general limits on candidates' expenditures, it noted that Congress "may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations." *Id.* at 57 n.65; *see also id.* at 95 ("[A]cceptance of public financing entails voluntary acceptance of an expenditure ceiling."). By way of explanation, the Court observed that a candidate's decision to forgo private financing and accept public financing is a "voluntar[y]" one analogous to the decision to accept only small-dollar contributions. *Id.* at 57 n.65.

Not long after *Buckley*, a three-judge district court addressed the restrictions imposed on candidates by FECA's public financing system, and this Court, sitting *en banc*, subsequently adopted its reasoning. *See Republican Nat'l Comm. v. FEC*, 487 F. Supp. 280 (S.D.N.Y.) (three-judge court) ("*RNC II*"), *aff'd mem.*, 445 U.S. 955 (1980); *see also Republican Nat'l Comm. v. FEC*, 616 F.2d 1, 2 (2d Cir.) (en banc) (holding that challenged provisions of FECA were constitutional

for the reasons set forth in *RNC II*), *aff'd mem.*, 445 U.S. 955 (1980).[3] In that case,

the Republican National Committee ("RNC") challenged the system's

$20,000,000 cap on the expenditures of PFCs seeking the presidency (which, as

noted above, *Buckley* distinguished from the general expenditure caps that it

found invalid), and the resulting ban on PFCs' acceptance of private

contributions beyond that amount. The RNC contended that those limits violated

the First Amendment because they "restrict[ed] the ability of candidates and

their parties, supporters and contributors to communicate their ideas."

*Republican Nat'l Comm. v. FEC*, 461 F. Supp. 570, 573 (S.D.N.Y. 1978) ("*RNC I*"). In

effect, "[w]hat plaintiffs [sought was] the right to solicit, receive and spend both

---

[3] The procedural posture of *RNC II* was unusual. The case involved challenges to FECA and the Fund Act, each of which provided special procedures for judicial review. A three-judge district court was convened "to decide the constitutional issues raised with respect to the Fund Act," as required by that statute. *Republican Nat'l Comm.*, 616 F.2d at 1. The single-judge district court before which the case was brought also certified questions regarding the constitutionality of FECA to this Court sitting *en banc*, as required by FECA. *Id.* The three-judge court, which comprised two circuit judges and the original district judge, then issued an opinion upholding the constitutionality of the Fund Act, *see RNC II*, 487 F. Supp. at 282, and the next day this Court, sitting *en banc*, answered the questions certified to it by concluding that the challenged provisions of FECA were constitutional "substantially for the reasons set forth in the opinion of the three-judge court," *Republican Nat'l Comm.*, 616 F.2d at 2. Both decisions were summarily affirmed by the Supreme Court. *Republican Nat'l Comm. v. FEC*, 445 U.S. 955 (1980) (mem.).

public and private campaign funds, without any limitations." *RNC II*, 487 F. Supp. at 283.

The three-judge court first addressed the plaintiffs' suggestion that certain candidates were "somehow or other forced as a practical matter to accept public funding" with its attendant restrictions. *Id.* at 283. The court concluded that they were not, since a candidate could raise a similar or greater amount of funds through private fundraising. *Id.* at 283–84. The court then turned to "the issue of whether Congress may lawfully condition a presidential candidate's eligibility for public federal campaign funds upon the candidate's voluntary acceptance of limitations on campaign expenditures and private contributions." *Id.* at 284. This question, in turn, required deciding, *inter alia*, whether such a condition would abridge the rights of the candidate. *Id.*

The court observed that, "[w]hile Congress may not condition benefit on the sacrifice of protected rights, the fact that a statute requires an individual to choose between two methods of exercising the same constitutional right does not render the law invalid, provided the statute does not diminish a protected right." *Id.* at 284–85 (citations omitted). The public financing system at issue passed muster under that framework, as it provided a candidate with an additional

method of speaking that the candidate would elect only if it enhanced her ability to speak:

> The Fund Act merely provides a presidential candidate with an *additional* funding alternative which he or she would not otherwise have and does not deprive the candidate of other methods of funding which may be thought to provide greater or more effective exercise of rights of communication or association than would public funding. Since the candidate remains free to choose between funding alternatives, he or she will opt for public funding only if, in the candidate's view, it will *enhance* the candidate's powers of communication and association.

*Id.* at 285. For that reason, *RNC II* held that "as long as the candidate remains free to engage in unlimited private funding and spending instead of limited public funding, the law does not violate the First Amendment rights of the candidate or supporters." *Id.* at 284.

Subsequent decisions by our sister circuits have employed a similar logic of voluntariness in evaluating challenges to public financing systems. As the Court of Appeals for the Fourth Circuit observed, "[s]ince *Buckley* the circuit courts have generally held that public financing schemes are permissible if they do not effectively coerce candidates to participate in the scheme." *N.C. Right to Life Comm. Fund for Indep. Political Expenditures v. Leake*, 524 F.3d 427, 436 (4th Cir.

21

2008). That is because such schemes do not burden candidates' rights if they merely create another viable funding option rather than compel candidates to choose public funding. *See Daggett v. Comm'n on Gov't Ethics & Election Practices*, 205 F.3d 445, 467 (1st Cir. 2000) ("A law providing public funding for political campaigns is valid if it achieves 'a rough proportionality between the advantages available to complying candidates . . . and the restrictions that such candidates must accept to receive these advantages.'" (ellipsis in original) (quoting *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 39 (1st Cir. 1993))); *Gable v. Patton*, 142 F.3d 940, 948 (6th Cir. 1998) ("[T]he central question we are faced with is whether the substantial advantage [afforded to PFCs] rises to the level of unconstitutional coercion."); *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1552 (8th Cir. 1996) ("Under this choice-increasing framework, candidates will presumably select the option that they feel is most advantageous to their candidacy. Given this backdrop, it appears to us that the State's scheme promotes, rather than detracts from, cherished First Amendment values.").

### 2. Candidates

With this backdrop in mind, we conclude that the Contribution Limit does not violate PFCs' First Amendment rights. Appellants argue that the limit

burdens PFCs' ability to speak and associate, particularly with political parties, and that there is no important interest justifying it. But appellants do not assert that the Option's terms compel candidates to accept public financing and its attendant restrictions. Rather, the thrust of their claim is that accepting that deal puts them at a disadvantage relative to privately financed candidates. If that is so, then a candidate will rationally choose to decline public financing under the Option, and the Option's limits on PFCs' acceptance of contributions will not apply to her. If, on the other hand, she believes that the fixed amount of funds awarded in a public grant will afford her greater funding than she can raise in private contributions, then accepting the grant will increase the funds she can use to speak, despite the Contribution Limit.[4] Thus, in neither case does the Contribution Limit diminish her ability to speak and associate. Rather, it merely

---

[4] Candidates who cannot raise in private contributions anything close to the amount of a public grant may well feel that accepting public funds gives them the best chance to run a competitive race, but they cannot complain that the prohibition on raising private funds beyond the amount of the public grant disadvantages them, since, without the grant—which, as appellants recognize, a state is under no obligation to offer—those candidates would be left only with the private funds they could raise. *Cf. Buckley*, 424 U.S. at 94–95 ("[T]he inability, if any, of minor-party candidates to wage effective campaigns will derive not from lack of public funding but from their inability to raise private contributions."). We note that this is not the situation before us, as appellants do not allege that they are effectively compelled to accept public funds.

23

allows a candidate to choose between "two methods" of speaking: either using privately raised funds or public funds, whichever the candidate believes will be greater. *RNC II*, 487 F. Supp. at 284; *cf. Buckley*, 424 U.S. at 95 n.129 (noting that FECA's public financing scheme "substitutes public funding for what the parties would raise privately"). Thus, because candidates remain free to reject the Option's funding and attendant Contribution Limit if they believe that private financing of their campaigns will facilitate greater speech, they cannot claim that the Options' restrictions in this regard burden their First Amendment rights.

Appellants nonetheless assert that the unconstitutional conditions doctrine entails a heightened level of scrutiny because the terms of the Option condition a benefit—here, a grant of public financing—on a PFC's ostensible sacrifice of a constitutional right—namely the ability to raise unlimited private contributions. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[The Government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech.").

In support of this view, they rely in part on a passage from *RNC II*, which explains that a statute may "require[] an individual to choose between two methods of exercising the same constitutional right . . . provided the statute does

24

not diminish a protected right or, where there is such a diminution, the burden is justified by a compelling state interest." 487 F. Supp. at 284–85. Appellants emphasize the phrase after the "or" and interpret it to demand heightened scrutiny. Yet *RNC II* clearly sets out a disjunctive test, under which a statute is constitutionally sound if it *either* does not diminish rights *or* is justified by a sufficient interest. For the reasons explained above, a candidate's ability to choose either to receive public funds or raise unlimited private funds does not diminish her ability to speak. Therefore, under *RNC II*, that condition need not be justified by a sufficient interest for the law to be constitutionally sound.

None of the other authority that appellants cite establishes that providing a choice between unlimited private fundraising and limited public funding triggers heightened scrutiny. In *Green Party v. Garfield*, this Court did review provisions of Connecticut's public financing system using "exacting scrutiny." 616 F.3d 213, 229–36 (2d Cir. 2010). However, the challengers in that case argued that Connecticut's eligibility requirements for public grants discriminated against minor party candidates, a different type of claim than the challenge to the Contribution Limit that appellants make here. *See id.* at 228–29; *see also infra*

25

§ II.C. Moreover, *Green Party* merely assumed without deciding that such scrutiny applied to the challenge in that case. 616 F.3d at 228–29.[5]

Appellants also reference a concurring opinion in *Ognibene v. Parkes*, 671 F.3d 174 (2d Cir. 2011), in support of their view that restrictions on contributions to PFCs must satisfy exacting scrutiny. Under the public financing system challenged in *Ognibene*, a candidate who opted for public funding could receive public matching funds equal to six times the amount of eligible contributions that the candidate raised, but contributions from lobbyists and entities that did business with New York City would not be matched. *Id.* at 179–80, 193. The opinion of the Court held that "the non-matching provision is closely drawn to address a sufficiently important governmental interest," a conclusion sufficient

---

[5] The *Green Party* plaintiffs also asserted that certain "trigger" provisions of Connecticut's public financing system burdened the speech of candidates who did not participate in that system. *Green Party*, 616 F.3d at 242. Under those provisions, a PFC would receive additional grants of public funds if the PFC's privately financed opponent made expenditures or received contributions totaling more than the expenditure limit applicable to the PFC, or if independent expenditures made in opposition to the PFC's candidacy exceeded a certain threshold. *Id.* at 221–22. We applied heightened scrutiny and struck down that portion of the law. *Id.* at 245. However, our analysis reflected the fact that the "trigger" provisions operated as a "penalty" on PFCs' *opponents*, who did not voluntarily submit to the strictures of the public financing system. *Id.* at 244. Here, appellants do not make a similar claim; they instead argue that the rights of PFCs themselves are burdened.

to satisfy exacting scrutiny. *Id.* at 193. Yet the Court also recognized that participation in the system was "voluntary," and that "[c]andidates who choose not to participate, and their contributors, are not prevented from freely expressing their political speech and associations." *Id.* This reasoning is consistent with the view that, so long as candidates may freely choose not to participate in public funding, the conditions on that funding do not burden candidates' rights.

The cases from our sister circuits cited above are of no more help to appellants' cause. While appellants suggest that some of those cases applied heightened scrutiny to provisions of public election financing schemes, the cases that they cite at most hold in the alternative that the provisions satisfied such scrutiny, after concluding that those provisions did not burden candidates' rights. *See, e.g.*, *Rosenstiel*, 101 F.3d at 1552–53 (holding that Minnesota's public financing system "survive[d] strict scrutiny," after having held that "the challenged provisions do not burden a candidate's First Amendment rights" because the system was "choice-increasing"); *see also Daggett*, 205 F.3d at 465 n.26, 472 (concluding that Maine's public financing scheme "d[id] not burden the First Amendment rights of candidates or contributors" and not reaching whether

a burden would be justified by a compelling interest). In sum, we conclude that the voluntary decision to accept public funds and forgo the ability to accept private contributions does not burden PFCs' First Amendment rights.[6]

But even if the Contribution Limit did impose a burden on PFCs' rights, that burden would be justified under intermediate scrutiny. "Going back to [*Buckley*], restrictions on political contributions have been treated as merely

---

[6] Appellants push back against this view with a purported *reductio ad absurdum*. They posit that, if a voluntary choice to accept public financing could never be understood to burden a candidate's rights, then a state could impose all sorts of troubling conditions on the receipt of public funds, such as requirements that PFCs refrain from discussing certain issues or associating with certain groups, possess certain religious affiliations, or not campaign against certain candidates. We need not address whether any of those specific conditions would be permissible because they are not before us in this case. However, we observe that this parade of horribles does not call into question the soundness of the analysis above.

As long as an offer of public funding to which an objectionable condition attached is not so advantageous that a candidate is effectively compelled to take it, we could expect the candidate to reject such an offer, in which case the condition would not burden the candidate. In contrast, were an offer of funding so advantageous that a candidate did feel compelled to accept the funding despite objecting to a condition attached thereto, we would review whether the condition burdened the candidate's rights and, if it did, review whether imposing that condition nonetheless satisfied the appropriate level of scrutiny. Similarly, if a prerequisite for access to public funding—like the fundraising and vote-share requirements challenged under the Equal Protection Clause of the Fifth Amendment in *Buckley*, 424 U.S. at 93—appeared to discriminate between candidates, we would apply exacting scrutiny. *See Green Party*, 616 F.3d at 229. In the abstract, it is hard to imagine that any of the conditions that appellants put forth would further a legitimate governmental interest such that it could pass the applicable level of scrutiny. Moreover, some—such as a requirement that PFCs possess a certain religious affiliation—would seem to violate rights beyond the speech and associational rights in the First Amendment. Thus, appellants have not shown that the foregoing analysis would permit any of the troublesome conditions that they identify to hinder candidates' exercise of their rights.

28

'marginal' speech restrictions subject to relatively complaisant review under the First Amendment, because contributions lie closer to the edges than to the core of political expression." *FEC v. Beaumont*, 539 U.S. 146, 161 (2003) (quoting *Colorado II*, 533 U.S. at 440). Thus, a contribution limit "passes muster if it satisfies the lesser demand of being closely drawn to match a sufficiently important interest." *Id.* at 162 (internal quotation marks omitted).

*Buckley* concluded that "public financing as a means of eliminating the improper influence of large private contributions furthers a significant governmental interest." 424 U.S. at 96. *RNC II* similarly held that the public financing scheme at issue in that case was "supported by a compelling state interest," specifically "'to reduce the deleterious influence of large contributions on our political process, to facilitate communication by candidates with the electorate, and to free candidates from the rigors of fundraising.'" 487 F. Supp. at 285 (quoting *Buckley*, 424 U.S. at 91). Restricting private contributions to PFCs is closely drawn to that interest because, "[i]f a candidate were permitted, in addition to receipt of public funds, to raise and expend unlimited private funds, the purpose of public financing would be defeated." *Id.* It is easy to see why: if such contributions were not limited, grants of public funds would simply serve

29

as stipends to candidates who would continue private fundraising efforts and thereby reintroduce the detriments of private fundraising that public election financing schemes were designed to avoid. Like the party in *RNC II*, appellants appear to advocate for "the right to solicit, receive and spend both public and private campaign funds, without any limitations." 487 F. Supp. at 283. But they cannot have it both ways without undermining the purpose of the Option. Rather, as the name "Option" suggests, candidates must choose between limited public grants and unlimited private contributions.

We conclude that Section 2983(b)(1)'s Contribution Limit does not burden the First Amendment rights of candidates, and, even if it did, it would survive exacting scrutiny because it is closely drawn to address the important governmental interests served by a public election financing scheme.

### 3.    Supporters

Section 2983(b)(1)'s Contribution Limit does not impermissibly burden the constitutional rights of PFCs' supporters either. As set forth above, *RNC II* held that "as long as the candidate remains free to engage in unlimited private funding and spending instead of limited public funding, the law does not violate the First Amendment rights of the candidate *or supporters*." 487 F. Supp. at 284

30

(emphasis added). The three-judge district court explained that, despite FECA's

contribution limitations, supporters retained "a wide range of ways to express

their support" given exclusions from FECA's definitions of contribution and

expenditure and supporters' ability to make unlimited independent

expenditures. *Id.* at 286. More centrally, any limitation on supporters' ability to

contribute was a function of their preferred candidate's voluntary choice:

> [S]ince the candidate has a legitimate choice whether to accept public
> funding and forego private contributions, the supporters may not
> complain that the government has deprived them of the right to
> contribute. There is nothing improper or unusual in recognizing
> that a candidate rather than his or her supporters should control the
> method of financing the campaign. In this respect the statute simply
> reflects the basic right of any person to accept or reject campaign
> contributions from any other person or committee, or not to run for
> office at all. . . . In short, it would be unreasonable to preclude a
> candidate who prefers public financing from using it instead of
> private financing merely because some supporters believe that the
> decision deprives them of the ability to contribute to the candidate's
> election in the precise way they would if the campaign were privately
> financed.

*Id.* In other words, if a candidate declines private contributions in favor of public

funds, the candidate's supporters cannot complain that the state has infringed

their rights to make contributions. Therefore, because candidates "remain[] free

31

to engage in unlimited private funding and spending instead of limited public funding" under the Option (as established above), the restriction on contributions that applies when candidates voluntarily elect public funding does not abridge supporters' rights. *Id.* at 284. Moreover, for the reasons stated above, such a restriction furthers sufficiently important government interests.

### 4. Political Parties

The same logic leads us to conclude that the Contribution Limit does not unconstitutionally burden the rights of political parties. Appellants argue at length that a party's ability to make expenditures in coordination with candidates—which, as explained above, are treated as "contributions" under the Act, Vt. Stat. Ann. tit. 17, § 2944(a), and are therefore subject to the Contribution Limit[7]—is critical to the party's role in Vermont's electoral system, and that the Contribution Limit unacceptably curtails this important function with respect to PFCs. However, appellants cannot show that parties are exempt from the

---

[7] As noted above, *see supra* n.2, we do not understand appellants to challenge the district court's holding that Vermont may regulate related expenditures as contributions. We therefore take it as a given in our analysis that related expenditures by parties are functionally equivalent to monetary contributions. *See Colorado II*, 533 U.S. at 464 ("There is no significant functional difference between a party's coordinated expenditure and a direct party contribution to the candidate.").

32

analysis set forth above, according to which a candidate's voluntary decision to accept public funds and their attendant limitations does not produce an unconstitutional burden on the rights of her supporters.

The Supreme Court has recognized that restrictions on party contributions to candidates can "threaten[] harm to a particularly important political right, the right to associate in a political party." *Randall*, 548 U.S. at 256. *Randall*, which held unconstitutional Act 64's stringent caps on contributions, identified two "special party-related harms," *id.* at 259, that those limits wrought: "limit[ing] the ability of a party to assist its candidates' campaigns by engaging in coordinated spending on advertising, candidate events, voter lists, mass mailings, even yard signs," *id.* at 257, and "preventing a political party from using contributions by small donors to provide meaningful assistance to any individual candidate," *id.* at 258. But *Randall* did not consider whether these harms were inflicted by limits on parties' assistance to candidates who elected public financing, as it did not address the constitutionality of Act 64's public election finance system. *See id.* at 239.

While restrictions on contributions can abridge the rights of political parties, so too can such limits abridge the rights of individual supporters. And

33

we know from the foregoing analysis that limits on individual contributions are constitutionally permissible when supporters' preferred candidate voluntarily chooses to accept public funds in lieu of private fundraising. *See RNC II*, 487 F. Supp. at 284. The question, then, is whether parties should be treated any differently than individual supporters when it comes to limits on coordinated expenditures in support of PFCs.

In *Colorado II*, the Supreme Court, addressing a challenge to FECA's limits on parties' coordinated expenditures, considered "whether a party is otherwise in a different position from other political speakers, giving it a claim to demand a generally higher standard of scrutiny before its coordinated spending can be limited." 533 U.S. at 445. The political party involved in that case argued that, because a party's most essential function is to coordinate with candidates to get them elected, limitations on that coordination are more serious than similar restrictions on individual supporters. The Court rejected this view. It noted that "political parties and other associations derive rights from their members," *id.* at 448 n.10, and it did not understand the respondent party to "claim a variety of First Amendment protection that is different in kind from the speech and associational rights of their members," *id.* at 448. The Court concluded that "[a]

34

party is not, therefore, in a unique position. It is in the same position as some individuals and [political committees], as to whom coordinated spending limits have already been held valid." *Id.* at 455.

We likewise conclude that, in the context of restrictions on contributions to PFCs, a party is in no different position than an individual supporter, who cannot complain that her rights have been violated when her preferred candidate opts for public funds rather than raising private contributions. A PFC's choice to accept public funds and thus the Option's restriction on expenditures coordinated with PFCs no more burdens a party's rights than would a candidate's choice not to coordinate with the party with regard to the party's expenditures. We therefore conclude that Section 2983(b)(1)'s contribution limit does not burden political parties' rights.[8]

---

[8] In light of this conclusion, we need not address appellants' arguments that certain party activities fall outside of the enumerated exemptions from the definition of contribution in Section 2901(4). These arguments seek to demonstrate that, assuming that restrictions on parties' coordinated expenditures on behalf of PFCs may constitute burdens on speech, the Act does in fact impose a significant burden, contrary to the district court's conclusion that Section 2901(4)'s exemptions permitted all of the activities that a party such as the VPP might wish to undertake on behalf of candidates. Because we conclude that such restrictions do not burden the rights of candidates and parties so long as candidates freely choose public funding, the extent of the restrictions under the Act is beside the point here.

In addition, while appellants seem to suggest that the construction of Section 2901(4)'s exemptions provides them with inadequate guidance about which related expenditures will

Moreover, even if the application of the Contribution Limit to political parties did burden those parties' rights, the limit survives the appropriate level of scrutiny, as it is closely drawn to sufficiently important governmental interests. *See id.* at 456 (concluding that restrictions on parties' coordinated spending were subject to "scrutiny appropriate for a contribution limit"). As explained above, restricting contributions to PFCs is necessary to sustain a public financing system, which itself serves important interests. *See Buckley*, 424 U.S. at 96; *RNC II*, 487 F. Supp. at 285.

Appellants contend, however, that parties' contributions are somehow different than contributions from other sources, such that there is no reason to restrict PFCs' receipt of the former. They assert that campaign finance laws' restrictions on speech may only be imposed to prevent *quid pro quo* corruption and its appearance, *see McCutcheon v. FEC*, 134 S. Ct. 1434, 1450 (2014), whereas the legislative findings that preface Act 90 imply that party contributions actually

---

count as contributions, they do not present a developed argument that those provisions are impermissibly vague, and we therefore do not consider it. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (internal quotation marks omitted)).

counteract corruption and therefore that there is no legitimate reason to limit such contributions. We do not think that the Act's findings lead to that conclusion. The findings explain that the Act imposes no limits on parties' contributions to (privately financed) candidates because "[p]olitical parties play an important role in electoral campaigns," which role is at risk of being "eclipse[d]" by less transparent, less democratic "expenditure-only political committees." 2014 Vt. Acts & Resolves 2. But this explanation as to why party contributions to privately financed candidates are unlimited has no direct relevance to contribution limits pertaining to PFCs.

Even if the Act's findings suggest that contributions by parties are comparatively benign, that does not mean that there is no reason to prevent all donors, including parties, from contributing to PFCs in order to maintain a system of public financing. Appellants argue that the interests that justify a public financing system, specifically relieving candidates of the burdens of private fundraising and obligations to donors, *see RNC II*, 487 F. Supp. at 285, are not served by restricting contributions by political parties. Yet application of the Contribution Limit to parties at the very least furthers an interest in preventing "the risk of corruption (and its appearance) through circumvention of valid

37

contribution limits." *Colorado II*, 533 U.S. at 456; *see also McCutcheon*, 134 S. Ct. at 1458 (adverting to the "Government's anticircumvention interest," which may justify restrictions that prevent circumvention of contribution limits). If a party could contribute unlimited funds to a PFC while individual supporters remained subject to the Act's Contribution Limit, those supporters might avoid the limit by donating funds to the party (up to $10,000, *see* Vt. Stat. Ann. tit. 17, § 2941(a)(5)) with the understanding that the funds would be contributed to the candidate. *See Colorado II*, 533 U.S. at 458 (explaining that, where contribution limits applicable to parties are higher than those imposed on individuals, "[d]onors give to the party with the tacit understanding that the[ir] favored candidate will benefit"). Such circumvention would undercut the Contribution Limit for individuals, which, as explained above, is necessary to maintain a public financing system. We therefore conclude that applying the Contribution Limit to parties is closely drawn to the important governmental interests served by a public financing system.

Finally, appellants' attempt to reframe the Contribution Limit as a speaker- or content-based restriction on parties' speech is unavailing. The Contribution Limit applies to all potential donors to PFCs, not solely political parties, so it is

not speaker-based. And, consistently with that limit, parties can still express support for PFCs through unlimited independent expenditures and any coordinated expenditures that fall within Section 2901(4)'s exemptions, which belies appellants' assertion that the limit imposes a content-based restriction targeting speech in support of PFCs. Appellants' argument boils down to the assertion that a party's inability to make coordinated expenditures that fall outside of Section 2901(4)'s exemption on behalf of PFCs will imply a withholding of support from those candidates; appellants characterize the purportedly implied message as a "state-imposed requirement of . . . misleading speech." Appellants' Br. 19–20. It strikes us as highly implausible that anyone would understand the legally mandated withholding of certain types of support—contributions and some coordinated expenditures—to imply a lack of support for a given candidate, particularly when a party could express robust support through permitted methods. In any event, appellants' argument proves too much: its logic would allow any prospective donor to argue that a contribution limit requires her to express less robust support than she wishes to express, thereby compelling misleading speech. But it is well-established that reasonable contribution limits are constitutional. *See Buckley*, 424 U.S. at 28–29.

39

Thus, there is no merit to appellants' view that the Contribution Limit is an impermissible content-based restriction.

In sum, we conclude that a candidate's voluntary choice to accept public funds in lieu of private contributions under the terms of the Option does not entail a burden on the rights of the candidate, her supporters, or political parties, and also that the Contribution Limit is closely drawn to important interests. We therefore reject appellants' challenge to Section 2983(b)(1)'s limit on contributions to PFCs.

## B. The Expenditure Limit

Section 2983(b)(1) prohibits PFCs from "expend[ing] any contributions except" those received under the terms of the Option, which logically bars them from expending their own funds, *i.e.*, self-financing their campaigns. Appellants contend that this restriction does nothing to avoid corruption or its appearance and therefore cannot survive the strict scrutiny to which limitations on campaign expenditures are subject. *See Davis v. FEC*, 554 U.S. 724, 740 (2008) (noting that if a restriction "imposes a substantial burden on the exercise of the First Amendment right to use personal funds for campaign speech, that provision

40

cannot stand unless it is justified by a compelling state interest." (internal

quotation marks omitted)).

Yet appellants have skipped a step: before such heightened scrutiny applies

they must show that there is a burden on candidates' rights, and this they cannot

do. *Buckley* recognized that a public financing system "may condition acceptance

of public funds on an agreement by the candidate to abide by specified

expenditure limitations." 424 U.S. at 57 n.65; *see also id.* at 95 ("[A]cceptance of

public financing entails voluntary acceptance of an expenditure ceiling."). As

explained above, if a candidate voluntarily chooses to accept public funds in lieu

of private fundraising—presumably because the grant of public funds will

expand her ability to speak—then prohibiting her from using funds other than

the public grant, including her own, does not burden her constitutional rights.

The Supreme Court's decision in *Davis*, cited by appellants, only reinforces

this conclusion. In *Davis*, the Court found unconstitutional a provision of the

Bipartisan Campaign Reform Act ("BCRA"), under which, if a candidate made

personal expenditures beyond a certain threshold, the candidate's opponent

would enjoy an expanded contribution limit. 554 U.S. at 729. The Court held that

this selective expansion of the contribution limit unconstitutionally penalized

expenditures of personal funds. *Id.* at 739. In so holding, the Court rejected the argument that this penalty on speech was permissible simply because candidates may choose whether or not to expend funds beyond the threshold. But the Court expressly distinguished that choice from the choice to accept public funds and concomitant restrictions. *Id.* at 739–40. The Court explained that, under the public financing system analyzed in *Buckley*, "a candidate, by forgoing public financing, could retain the unfettered right to make unlimited personal expenditures," whereas, under BCRA, a candidate had to choose either to restrict her spending or to trigger disparate contribution limits. *Id. Davis* therefore confirms that a public financing system under which a candidate may choose to exercise "the unfettered right to make unlimited personal expenditures" does not threaten the right to make personal expenditures in support of one's own campaign. Thus, we also reject appellants' challenge to the Expenditure Limit.

## C.     The Timing Restrictions

The last of appellants' constitutional challenges is to the Timing Restrictions contained in Section 2983(a). That section specifies that a candidate is not eligible for grants of public election funds if, before February 15 of an election year, she announces her candidacy or raises or spends more than $2000. Vt. Stat. Ann. tit.

17, § 2983(a). Appellants contend that these restrictions unjustifiably disadvantage PFCs, especially when those candidates' opponents engage in significant fundraising earlier than February 15.

The district court concluded that the Timing Restrictions, by defining the period during which prospective PFCs must raise the requisite amount of qualifying contributions, allowed an evaluation of whether those candidates enjoyed enough support to qualify for public financing and therefore furthered an interest in reserving public funds for viable candidates. *See Buckley*, 424 U.S. at 96 ("Congress' interest in not funding hopeless candidacies with large sums of public money necessarily justifies the withholding of public assistance from candidates without significant public support. Thus, Congress may legitimately require some preliminary showing of a significant modicum of support as an eligibility requirement for public funds." (internal citations and quotation marks omitted)). The district court accordingly held that the timing restrictions passed constitutional muster.

Appellants likewise frame the Timing Restrictions as "eligibility requirement[s]," to which *Buckley* applied exacting scrutiny. 424 U.S. at 93–96 (analogizing FECA's "eligibility formulae" for public grants to restrictions on

ballot access, which are subject to exacting scrutiny, and, while noting that the former were less restrictive than the latter, holding that the eligibility formulae satisfied such heightened scrutiny). *But see Green Party*, 616 F.3d at 228 (observing that *Buckley* left unresolved whether exacting scrutiny or some "less searching standard" applies to claims that a public financing system's qualification criteria discriminate against certain candidates). The Timing Restrictions, appellants argue, fail to satisfy exacting scrutiny because they do not further any governmental interests, much less "sufficiently important" ones, and they "unfairly or unnecessarily burden[] the political opportunity" of PFCs. *Buckley*, 424 U.S. at 95, 96.

At first glance, given Section 2983(a)'s reference to "eligib[ility] for Vermont campaign finance grants," it might seem that the Timing Restrictions should be analyzed as eligibility requirements of the kind at issue in *Buckley* and *Green Party*, which are subject (at least provisionally) to exacting scrutiny. But the eligibility requirements discussed in *Buckley* measured amounts of preliminary fundraising and, in the case of minor-party candidates, the share of the vote that the candidate's party earned in the previous election, 424 U.S. at 88–89; the ones in *Green Party* concerned those factors as well as the number of voter

44

registrations for a candidate's party and signatures collected, 616 F.3d at 219–20; and, as noted above, the Act itself contains a preliminary fundraising requirement specifying that a certain amount of qualifying contributions must be raised over a certain period, *see* Vt. Stat. Ann. tit. 17, §§ 2356, 2981(4), 2984(a). The Timing Restrictions, in contrast, do not require an affirmative show of support, but rather only refraining from certain actions. On their own, they impose no hurdle limiting access to public funding to certain viable candidates, since any candidate who wishes to receive such funding can abide by those limits. Moreover, the Timing Restrictions do not raise the specter of discrimination between major- and minor-party candidates, which was the crux of the challenges to the eligibility requirements in *Buckley*, *see* 424 U.S. at 97, and *Green Party*, *see* 616 F.3d at 224. In other words, while the restrictions at issue in *Buckley* and *Green Party* were alleged to discriminate between certain types of candidates in determining who could receive public funding—*i.e.*, which candidates could campaign as PFCs—here appellants argue that the Timing Restrictions discriminate between PFCs and privately financed candidates.

In this light, the Timing Restrictions are unlike the eligibility requirements in *Buckley* and *Green Party* and more akin to the limits on contributions to and

45

expenditures by PFCs found in Section 2983(b)(1) and discussed above. Indeed, the structure of the Act is suggestive: the Timing Restrictions and the Contribution and Expenditure Limits are all found in Section 2983, whose title indicates that it sets out "conditions" on grants, *see* Vt. Stat. Ann. tit. 17, § 2983, whereas it is the following section, entitled "Qualifying Contributions," that sets out what a candidate must do "[i]n order to qualify for" grants, *see id.* § 2984. We therefore analyze the Timing Restrictions not as requirements limiting eligibility for public funds, which may be subject to exacting scrutiny, *see Green Party*, 616 F.3d at 229, but rather as limits on PFCs that are conditions of the grant of public funding under the Option.

Under this framework, appellants' contention that the Timing Restrictions impermissibly "burden the political opportunity" of PFCs, *id.* at 228, when privately financed candidates enter a race before February 15 is misplaced. We understand the thrust of this contention to be that the restrictions afford privately financed candidates a head start on private fundraising, which advantages them over PFCs. However, as discussed above with regard to the Contribution and Expenditure Limits, a candidate may voluntarily choose between public financing, with its concomitant restrictions, and unlimited

private fundraising, and we would expect her to elect whichever option is most advantageous. If candidates believe that the Timing Restrictions disadvantage PFCs relative to privately funded candidates, they can freely choose to raise private funds instead. *Cf. Buckley*, 424 U.S. at 99 (concluding that FECA's public financing system did not disadvantage non-major parties, even if they received no benefit from it, in part because those parties remained "free to raise money from private sources"). We therefore remain unpersuaded by appellants' argument that the Timing Restrictions amount to a burden on candidates' rights.

Because the Timing Restrictions do not burden candidates' fundamental rights, they are subject only to rational basis review, which is exceedingly deferential. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 359 (2009) ("Given that the State has not infringed . . . First Amendment rights, the State need only demonstrate a rational basis to justify the [law]."). The restrictions meet this standard. Even though they are not needed to set the initial bound of the public financing qualification period, *see* Vt. Stat. Ann. tit. 17, §§ 2356, 2981(4), they nonetheless might make it more difficult for prospective PFCs to violate the requirement that PFCs raise the requisite amount of qualifying contributions only during that period. If a candidate cannot announce her bid for office or

accept significant contributions before the qualification period, it would seem less likely that she could raise significant funds before the qualification period and then misreport those funds as qualifying contributions made at the proper time. In addition, there are other conceivable rationales for the restrictions: for example, Vermont's legislature might believe it beneficial to reduce the amount of time candidates spend campaigning. For those reasons, we reject appellants' constitutional challenge to the Timing Restrictions.

* * *

In sum, we conclude that the Contribution Limit, the Expenditure Limit, and the Timing Restrictions in Act 90 do not violate the First Amendment rights of candidates, their supporters, or political parties. Given the free choice to accept the grants and restrictions that public financing entails or to engage in unlimited private fundraising, candidates cannot complain that electing the former course burdens their rights. And even if, as appellants contend, the detriments of public financing are so severe that few candidates, if any, will elect to receive public funds, that is a problem for Vermont's legislature, not this Court, to address. We therefore affirm the district court's dismissal of appellants' claims.

## III. Attorney's Fees

Appellants' other challenge on appeal is to the district court's denial of their motion for attorney's fees under 42 U.S.C. § 1988(b). In an action under 42 U.S.C. § 1983, a "court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b). The district court concluded that appellants were not entitled to fees because they could not be considered "prevailing parties" in the litigation below, as the court dismissed all of their claims and did not grant declaratory or injunctive relief.

Appellants argue that this conclusion was erroneous because, although the March 9, 2016 Opinion and Order dismissed their claims, it nonetheless contained a favorable statutory construction. The district court held that, "[t]o bring the statutory provisions into harmony, and as apparently conceded by the Defendants in their briefing, the contribution exemptions in Section 2901(4) must apply throughout the statute," such that "a related expenditure is considered a contribution to a candidate *unless* the expenditure is an activity that is specifically exempted under [Section] 2901(4)." App. 110. This holding, appellants contend, amounts in practice to a declaratory judgment granting part of the relief that they had requested in the SAC. *See* App. 48–49 at ¶ 104 (requesting "a declaratory

49

judgment that the political party activities enumerated in §[]2901(4) . . . are not 'in-kind contributions'").

"[P]laintiffs are only eligible for attorneys' fees if they 'achieve some material alteration of the legal relationship' between them and their adversaries, *and* that change bears a 'judicial imprimatur.'" *Perez v. Westchester Cnty. Dep't of Corr.*, 587 F.3d 143, 149 (2d Cir. 2009) (quoting *Roberson v. Giuliani*, 346 F.3d 75, 79–80 (2d Cir. 2003)). It is well established that "enforceable judgments on the merits and court-ordered consent decrees" fulfill these requirements, *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001), and so can other judicial actions provided that they "carr[y] with [them] sufficient judicial imprimatur," such as a dismissal order providing that the district court will retain jurisdiction to enforce a settlement agreement, *Perez*, 587 F.3d at 151 (quoting *Roberson*, 346 F.3d at 81). However, the Supreme Court has observed that a favorable "judicial pronouncement . . . unaccompanied by judicial relief" has not warranted a fee award. *Buckhannon*, 532 U.S. at 606 (internal quotation marks and emphasis omitted). Indeed, the Court has stated that "a favorable judicial statement of law in the course of litigation that results in judgment against the plaintiff does not suffice to render

50

him a 'prevailing party.' Any other result strains both the statutory language and common sense." *Hewitt v. Helms*, 482 U.S. 755, 763 (1987).

The district court's adoption of appellants' preferred interpretation of Section 2901(4) did not effect a material alteration in the parties' relationship. That interpretation of the statute is a natural one: under standard principles of statutory construction, the exemption of specific activities from the definition of contribution should be understood as an exception to the general treatment of related campaign expenditures as contributions. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("It is a commonplace of statutory construction that the specific governs the general. . . . To eliminate the contradiction [between conflicting provisions in a statute], the specific provision is construed as an exception to the general one." (internal quotation marks omitted)). Moreover, Vermont did not contest that interpretation before the district court. This suggests that the adoption of that interpretation did not alter the status quo, such as by forestalling impending enforcement. That Vermont initiated the state enforcement action against Corren does not indicate otherwise: while the district court held that related expenditures falling within the exemptions in Section 2901(4) do not constitute contributions, Vermont could

(and did) argue that the email blast was nonetheless a contribution under the terms of that ruling because the email blast did not fall within any of Section 2901(4)'s exemptions.

If plaintiffs could receive fees under § 1988 whenever they sought confirmation of a certain statutory construction—even an uncontested or obvious one—and the court adopted that interpretation, then it would be quite easy for plaintiffs to "prevail" even where they lost on the merits. But *Hewitt* rejects this view, and instead stresses that what matters is not a judicial pronouncement but "the settling of some dispute *which affects the behavior of the defendant towards the plaintiff*," which appellants have not demonstrated on the record before us. 482 U.S. at 761. Accordingly, we find no error in the district court's conclusion that appellants were not prevailing parties and affirm the denial of appellants' motion for attorney's fees.

## CONCLUSION

We **AFFIRM** the judgment of the district court.